## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

CLARICE J. SANCHEZ,

       Plaintiff,

v.                                     No. Civ. 07-706 LH/DJS

TOM VILSACK,
Secretary, U.S. Department of Agriculture,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Tom Vilsack's Motion for Summary Judgment and Memorandum in Support (Doc. 65); Plaintiff Clarice J. Sanchez's Motion for Summary Judgment (Doc. 66); and Plaintiff Sanchez's Amended Cross-Motion for Summary Judgment (Doc. 84). Plaintiff filed her Amended Cross-Motion for Summary Judgment in order to correct her procedural error in not incorporating her statement of facts in the motion. The Court granted Plaintiff's motion to file the Amended Cross-Motion for Summary Judgment. The Court will therefore deny Plaintiff's Cross-Motion for Summary Judgment (Doc. 66) as moot and will consider the merits of Plaintiff's Amended Cross-Motion for Summary Judgment. Having considered Defendant's motion for summary judgment, Plaintiff's amended cross-motion for summary judgment, the briefs, evidence, relevant law, and otherwise being fully advised, the Court concludes that Defendant's motion for summary judgment should be granted as to all Plaintiff's claims and Plaintiff's amended cross-motion for summary judgment should be denied.

## I. INTRODUCTION

       Plaintiff, at the times relevant to the complaint, was a National Forest Service secretary. On

January 14, 2003, she fell down a flight of stairs at work, resulting in irreversible brain damage that caused the complete loss of her left field vision in both of her eyes. She alleges that, following her injury, she requested a hardship transfer to accommodate her disability. She asserts in Count I of her complaint that Defendant discriminated against her when he denied her request for a hardship transfer in violation of the Rehabilitation Act, 29 U.S.C. § 791. In Count II of her complaint, Plaintiff alleges that Defendant, in violation of Title VII, refused to provide reasonable accommodation for her disability in retaliation for her having provided witness statements during the period from 1999 to 2003 for four other co-workers who had filed discrimination complaints. On April 4, 2010, Plaintiff amended her complaint to add a third count for hostile work environment against Defendant for allowing her supervisor to repeatedly and continuously harass her because of her disability in violation of the Rehabilitation Act.

## II.    FACTUAL BACKGROUND[1]

Plaintiff Sanchez was employed by the United States Department of Agriculture, Forest Service ("Forest Service"), Region 8, in Lufkin, Texas, beginning in November 2002, as a Secretary, GS-0318-08.  (Def.'s Mot. for Summ. J. (Doc. 65), Undisputed Fact ("UF") ¶ 1.)  As of January 2003, Plaintiff had worked for the Forest Service for approximately 25 years, but she had only recently moved to Lufkin, Texas, to take the promotion to the GS-08 position of Executive Assistant to the Forest Supervisor.  (See Pl.'s Am. Cross-Mot. for Summ. J. (Doc. 84), UF ¶ 1.)

On January 14, 2003, Plaintiff, while leaving the office building to attend a meeting, missed the first step of a long set of stairs and fell to the bottom.  (Id., UF ¶ 2.)  She managed to get up, walk

---

[1]Many of the following facts are undisputed.  Where a dispute of fact exists, the Court has so noted and explained the respective facts, supported by the evidence, favoring each party. When analyzing the respective cross-motions for summary judgment, the Court will construe the facts in favor of the non-moving party.

back to her car and drive to the meeting.  (*Id.*)  After approximately 30 minutes in the meeting, Plaintiff began to experience a severe headache, for which she took some aspirin, but she soon began to feel cold and ill and started to shake.  (*Id.*)  She left the meeting to go lie down in her car where her co-workers later found her and had her transported to the hospital.  (*Id.*)

Plaintiff was in the hospital for almost three weeks.  (*Id.*, Ex. 23 (Doc. 84-27) ¶ 4.)  Plaintiff suffered a traumatic brain injury ("TBI") from her fall.  (*Id.*, UF ¶ 4.)  The TBI caused a complete left homonymous hemianopsia, which is an injury to the nerves in the brain that transmit the images from the eyes to the brain.  (*Id.*)  She is unable to see objects to the left of her body with either eye when the eyes are focused straight ahead.  (*See id.*, Ex. 8 (Doc. 84-10) at 1.)  Plaintiff has "a normal blind spot on the right eye and an absolute 100% left hemianopsia on the right eye.  The same finding is present on the left eye except the hemianopsia covers the blind spot."  (Def.'s Mot. for Summ. J., Ex. B (Doc. 65-3).)  The result is that Plaintiff lost "50 percent of the total visual field in the eye."  (Pl.'s Am. Cross-Mot. for Summ. J., Ex. 1 (Doc. 84-2) at 46.)  Plaintiff's condition is permanent.  (*Id.*, Ex. 2 (Doc. 84-3) at 1-2.)

The American Medical Association ("AMA") in its Guides to the Evaluation of Permanent Impairment considers a complete homonymous hemianopia to be as equally disabling as a visual acuity loss to 20/200.  (*See id.*, Ex. 5 (Doc. 84-7) at 3.)  The AMA rates a homonymous hemianopia as a 50% impairment of the whole person.  (*See id.*, Ex. 1 (Doc. 84-1 & Doc. 84-2) at 33, 46-47; Ex. 2 (Doc. 84-3) at 2; and Ex. 5 (Doc. 84-7) at 3-4. )  Dr. Clark Watts, based on a review of Plaintiff's medical records, rates Plaintiff as having a 50% total-body impairment under the AMA Guidelines. (*See id.*, Ex. 1 (Doc. 84-1 & Doc. 84-2) at 33, 46-47.)[2]

---

[2]Defendant objects to the Court's consideration of the AMA evidence because it is inadmissible hearsay and irrelevant.  Plaintiff submitted not only portions of the AMA Guides,

Dr. Watts has not personally examined Plaintiff.  (*See id.*, Ex. 1 (Doc. 84-2) at 53-54.) Nevertheless, Dr. Watts asserts that someone with Plaintiff's syndrome will generally ignore to some extent the left side of the person's body.  (*See id.*, Ex. 1 (Doc. 84-2) at 53-54 and Ex. 8 (Doc. 84-10) at 1.)  To understand the seriousness of her disability, Dr. Watts compares the disability to being paralyzed on the left side.  (*See id.*, Ex. 1 (Doc. 84-2) at 57 and Ex. 8 (Doc. 84-10) at 1.)  He explains his comparison as follows:

> For example, suppose she were sitting in a chair, and a granddaughter came to her from her left side.  If she could see her, that is if she did not have the homonymous hemianopsia, but instead had a paralysis of her left arm and hand, she could not acknowledge the child by petting her on her head with her paralyzed arm and hand. With the homonymous hemianopsia she could not see her approach, and thus even with a normal arm and hand she would not recognize her by petting her head because she would not see her come up.  In either case, she is unable to greet the child, because of disabilities that have the same effect.

(*Id.*, Ex. 8 (Doc. 84-10) at 1.)  Dr. Watts admits, however, that he does not know whether Plaintiff actually ignores her left side because he has not examined her and none of the notes he saw addresses her ignoring her left side.  (*See id.*, Ex. 1 (Doc. 84-2) at 53-54.)  Dr. Watts additionally testified that, because there is no outward evidence of an injury, a person with Plaintiff's condition usually has more difficulty learning exactly what is wrong with him or her, which can lead to anxiety and depression, as well as further psychological problems, if the person's treating physician does not teach the person how to accommodate and deal with the condition.  (*See id.*, Ex. 1 (Doc.

---

but also the deposition of Dr. Watts who explained the 50% impairment rating.  Statements contained in published treatises on a subject of medicine, established as a reliable authority by the testimony of an expert witness or judicial notice, are admissible under the learned treatises hearsay exception.  *See* Fed. R. Evid. 803(18).  Although Dr. Watts did not personally evaluate Plaintiff, he did review her medical records, a common practice for medical experts in forming opinions on a patient's condition.  Based on Dr. Watts's testimony, the Court finds that the AMA impairment evidence is not excluded by the hearsay rule.  The Court will discuss the relevance of this evidence *infra* in its Legal Analysis section.

84-2) at 60-61.)

Despite her 100% left hemianopsia, with corrective glasses, Plaintiff has 20/20 vision in her central vision.  (*See* Def.'s Mot. for Summ. J., Ex. B (Doc. 65-3).)  Although she lost her left peripheral vision, Plaintiff's right peripheral and central vision are fine.  (*See id.*, Ex. A (Doc. 65-2) at 80-81; Pl.'s Am. Cross Mot. for Summ. J., Ex. 1 (Doc. 84-1) at 42; Def.'s Resp., Ex. H (Doc. 73-1) at 14-15.)

Plaintiff can read using her central vision, but she has to turn her head to the left to use her central vision in order to read everything with central vision as opposed to peripheral vision.  (*See* Def.'s Resp., Ex. H (Doc. 73-1) at 48-50.)  When she first starts to read, her vision immediately goes to the center of the page instead of to the left side of the page.  (*See* Pl.'s Am. Cross Mot. for Summ. J., Ex. 3 (Doc. 84-4) at 81-82.)  She has to mentally make herself start reading on the left side of the page.  (*Id.*)  She has to be particularly focused when reading numbers to make sure she is starting with the first number and she has to re-check her work.  (*See id.*)

Plaintiff's TBI also caused her to develop a severe headache.  (*See* Def.'s Mot. for Summ. J., Ex. B (Doc. 65-3).)  Plaintiff suffered from headaches for more than two years thereafter.  (Def.'s Reply, Ex. M (Doc. 76-1) at 29.)  She took Tylenol for the headaches.  (*Id.*)  She gradually improved with less frequent headaches, and they eventually subsided altogether.  (*See id.*)

After her hospitalization, Plaintiff was in occupational therapy for approximately four weeks.  (*Id.*, Ex. M (Doc. 76-1) at 99.)  After she was released from occupational therapy, she returned to work in April 2003.  (*Id.*; Pl.'s Am. Cross-Mot. for Summ. J. (Doc. 84), UF ¶ 2.)  Plaintiff returned to work full time in May 2003.  (Def.'s Mot. for Summ. J. (Doc. 65), UF ¶ 3.)

Plaintiff's medical release for work listed no limitations.  (*See* Def.'s Mot. for Summ. J., Ex. A (Doc. 65-2) at 59-61.)  As of March 5, 2003, Plaintiff's opthamologist, Dr. Thomas E. Duncan,

believed that, because of the length of time since the onset of the problem (50 days), he believed that it was unlikely there would be any improvement in her condition. (*See id.*, Ex. B (Doc. 65-3).) He advised her not to drive and "to persist with other efforts to adapt to her situation." (*Id.*) Dr. Watts likewise agreed that Plaintiff's physical injury was unlikely to improve after 50 days from the injury. (*See* Def.'s Resp., Ex. H (Doc. 73-1) at 6.) Shortly after the accident, Plaintiff's initial injury to the tissues had stabilized. (*See id.*, Ex. H (Doc. 73-1) at 7.)

The first couple of weeks back to work, Plaintiff's neighbor drove her to work. (Def.'s Mot. for Summ. J., Ex. A (Doc. 65-2) at 58-59.) After that, Plaintiff drove herself to work, using back roads and leaving early in the morning to avoid traffic. (*See id.*, Ex. A at 58-59, 61.) Since her accident, Plaintiff has been able to care for herself and walks and bicycles on a regular basis. (*Id.*, UF ¶ 14.)

When she returned to work, she had to use extra concentration when working with numbers, which resulted in tasks with numbers taking longer, "which really took its toll" on her. (*See* Pl.'s Am. Cross. Mot. for Summ. J., Ex. 3 (Docs. 84-4 & 84-5) at 83-84.) Plaintiff can no longer use the computer for more than approximately 45 minutes without experiencing pain and eye strain. (*See id.*, Ex. 12 (Doc. 84-15) at 2 and Ex. 23 (Doc. 84-27) ¶ 5.) In addition, when Plaintiff returned to work, lights, particularly from computers, window glares, and fluorescent lighting glares, bothered Plaintiff immensely. (*See* Def.'s Reply, Ex. M (Doc. 76-1) at 28-29.) Fred Salinas, the Forest Supervisor in Lufkin and Plaintiff's immediate supervisor, accommodated her condition by installing special lights and, later, by moving her into an office where she could dim the lights. (*See* Pl.'s Am. Cross Mot. for Summ. J., UF ¶ 11 and Ex. 13 (Doc. 84-16) at 2.) Mr. Salinas, although he did not know the specifics of Plaintiff's injuries, knew that when she returned to work Plaintiff had a difficult time focusing on tasks and complained of extreme headaches and that light glare was

very strenuous on her eyes.  (*See id.*, Ex. 10 (Doc. 84-12) at 3.)

On April 18, 2003, Plaintiff requested via email a hardship transfer to Region 3 in Albuquerque, New Mexico, which Mr. Salinas supported.  (*See id.*, Ex. 9 (Doc. 84-11); Def.'s Mot. for Summ. J., UF ¶ 8.)  Plaintiff stated in her email that she was requesting the transfer because there were no doctors in Lufkin that specialized in the on-going continuous health care she needed "and more important I need my family and support of my friends to carry me through this healing process."  (Pl.'s Am. Cross Mot. for Summ. J., Ex. 9 (Doc. 84-11).)  She also discussed the lack of public transportation in Lufkin as a problem in trying to make doctors appointments.  (*See id.*)  Plaintiff sent the email to Mr. Salinas and copied Rudy Gutierrez, the Director of Human Resources for Region 3.  (*See id.*; Def.'s Mot. for Summ. J., Ex. G at 1.)  Mr. Gutierrez understood Plaintiff's email to be a request for reasonable accommodation for her medical condition.  (Pl.'s Am. Cross Mot. for Summ. J., Ex. 18 (Doc. 84-20) at 42.)  In September 2003, Mr. Salinas sent out a request for assistance to try to secure Ms. Sanchez a hardship transfer to Region 3.  (*Id.*, UF ¶ 11.)

Plaintiff was given a 120-day detail to the Region 3 Office from September 2003 until February 2004.  (*See id.*, Ex. 10 (Doc. 84-12) at 4; Def.'s Mot. for Summ. J., UF ¶ 9.)  Mr. Salinas requested the detail and Region 8 paid Plaintiff's salary.  (*See* Def.'s Resp., Ex. I (Doc. 73-2) at 46-48.)  Plaintiff worked in the executive suite.  (*See id.*)

During her detail, Plaintiff drove herself to work, leaving work early and going home late to avoid traffic and avoiding highways and busy roads.  (Def.'s Mot. for Summ. J., Ex. A at 64.)  Region 3 Forest Service employees informed Lucia Turner, Deputy Regional Forester, Region 3, that Plaintiff's performance during her detail was unacceptable, and at least one employee, Carmen Garcia, recommended that Plaintiff not be permanently assigned to Region 3.  (*See* Def.'s Mot. for Summ. J., Ex. D (Doc. 65-5) at 8; Pl.'s Am. Cross-Mot. for Summ. J., Ex. 11 (Doc. 84-13) at 50-53.)

7

Ms. Garcia also told Ms. Turner that Plaintiff took too long to complete correspondence database tasks and that she was not as alert or efficient as she recalled Plaintiff being when she worked previously in the region.  (*See* Pl.'s Am. Cross-Mot. for Summ. J., Ex. 11 (Doc. 84-13) at 50-53, 57-60.)  Plaintiff's immediate supervisor, Marian Bucan, informed Ms. Turner that, although Plaintiff's work on travel was very good, Ms. Bucan, on more than one occasion, had to ask Plaintiff not to talk so much or visit so much with other employees because it was disruptive.  (*See id.*, Ex. 11 (Doc. 84-13) at 50-53.)  Ms. Turner's personal recollection of Plaintiff in the executive suite was that she was disruptive.  (*Id.*, Ex. 11 (Doc. 84-13) at 53.)  Mr. Gutierrez also observed that Plaintiff was doing too much chatting with other people at her desk.  (*See* Def.'s Resp., Ex. J (Doc. 73-4) at 90-92.)

During the period of April 2003 until June 2006, Plaintiff made many efforts to try to get reassigned to a vacant position in Albuquerque.  (*See* Pl.'s Am. Cross-Mot. for Summ. J. (Doc. 81-1), UF ¶ 15.)  In addition to the April 2003 request, Plaintiff made three other requests for transfer, including one on January 26, 2005.  (*Id.*)  She made a direct plea for reassignment based on her purported medical needs to the head of the Forest Service, Chief Dale Bosworth.  (*See id.*)  She enlisted the assistance of Billie Weaver, another Forest Service employee who worked with Pathfinders, a group that provided assistance to disabled employees.  (*Id.*)  Ms. Weaver made requests to Forest Service management officials on behalf of Ms. Sanchez for reassignment to Albuquerque.  (*See id.*)  Mr. Salinas also made several additional requests to managers in Region 3 for a hardship transfer for Plaintiff.  (*See id.*)

Ms. Turner attempted to find a position for Plaintiff in the Albuquerque area.  (*See* Def.'s Mot. for Summ. J., Ex. D (Doc. 65-5) at 80-81; Def.'s Resp., Ex. I (Doc. 73-2) at 66-67.)  Ms. Sanchez, however, notified Ms. Turner that she applied for one particular position, a Grade 7/8 position in Region 3, but Ms. Turner took no action to determine whether Plaintiff was qualified for

that particular position.  (*See* Pl.'s Am. Cross Mot. for Summ. J., Ex. 11 (Doc. 84-14) at 67-72.)

Rudy Gutierrez also attempted to find a position for Plaintiff in Region 3.  (*See* Def.'s Mot. for Summ. J., Ex. F (Doc. 65-8) at 33-34 and Ex. G (Doc. 65-9) ¶¶ 2-3.)  Mr. Gutierrez offered Plaintiff a secretarial position, but it was a GS-6 position.  (*See* Def.'s Resp., Ex. J (Doc. 73-3) at 32-33.)

In explaining his understanding of the Forest Service's responsibility to make reasonable accommodations for an employee, Mr. Gutierrez testified that an employer could first try to accommodate the employee in their work site, for example by adjusting hours, changing duties, or changing desks.  (*See* Pl.'s Am. Cross Mot. for Summ. J., Ex. 18 (Doc. 84-20) at 49.)  Mr. Gutierrez believed that, if a disabled employee could not be accommodated in her job and there is a vacant, funded position for which the employee qualifies, the agency can reassign the employee to the vacant position, but does not have to.  (*See id.*, Ex. 18 (Doc. 84-20) at 50.)  Mr. Gutierrez testified that the agency is not required to transfer the person into the vacant position, but instead, can continue to try to accommodate the person at the work site or continue to try to place them in other positions that become available.  (*See id.*, Ex. 18 (Docs. 84-20 & 84-21) at 52-55.)  Mr. Gutierrez stated that transfer is usually the last resort.  (*See id.*)  Mr. Gutierrez further testified that, if a manager did not want the person to be hired into the vacant position, a higher level manager could direct the lower level manager to make it happen.  (*See id.*, Ex. 18 (Doc. 84-21) at 59-61.)  He stated that a human resources or civil rights specialist could urge a supervisor to select the disabled employee, but the specialists could not make the decision.  (*See id.*)

The parties dispute whether Plaintiff was qualified for any of the available GS-8 positions that were vacant in Albuquerque.  Defendant asserts that Plaintiff was not qualified for any open GS-8 positions in Albuquerque, relying on the testimony of Ms. Turner and Mr. Gutierrez.  Ms.

9

CASE CITATION

Turner testified that the GS-8 positions in Region 3 were specialized skill positions, for which Plaintiff, as a secretary, did not qualify. (*See* Def.'s Mot. for Summ. J., Ex. D (Doc. 65-5) at 63.) Plaintiff was offered a GS-6 position in Human Resources, for which she did qualify, but she turned down the position because she did not want to give up her Grade 8. (*Id.*, Ex. E (Doc. 65-7) ¶ 3.) Mr. Gutierrez similarly testified that Plaintiff's entire experience had been in secretarial or clerical positions, so she did not have the requisite specialized experience for the available GS-8 positions. (*See id.*, Ex. F (Doc. 65-8) at 33-34 & Ex. G (Doc. 65-9) ¶ 3.) Specifically, she did not have experience with the laws and policies for implementing personnel processes, accounting processes, or procurement processes. (*See id.*, Ex. F (Doc. 65-8) at 33-34; Def.'s Resp., Ex. J (Doc. 73-4) at 80-81.) Mr. Gutierrez, however, admitted that when he made these statements concerning Plaintiff not being qualified, he had not taken the time beforehand to determine for what positions Plaintiff had applied. (*See* Pl.'s Am. Cross Mot. for Summ. J., Ex. 18 (Doc. 84-22) at 87.) Ms. Turner also admitted when she made her statements concerning Plaintiff's qualifications, she had not previously spoken to a personnel specialist regarding Plaintiff's qualifications for any GS-8 positions or reviewed any of the vacancies in the regional office. (*See id.*, Ex. 11 (Doc. 84-14) at 71-72.)

In contrast, Plaintiff asserts that she was qualified for numerous positions in Region 3 during the period in question. Plaintiff relies on evidence from the AVUE computer system, which does the initial screening to determine whether applicants are qualified for a vacant position. (*See* Def.'s Resp., Ex. J (Doc. 73-4) at 62-64.)[3] An applicant applies through the AVUE system, answering

---

[3]Plaintiff also bases her assertion on the fact that she applied for numerous GS-7 and GS-8 positions, and when she called the agency to speak with an employee about the positions, each time, the employee would respond that someone else was selected for the position, but that Plaintiff was well-qualified. (*See* Pl.'s Am. Cross Mot. for Summ. J., Ex. 4 (Doc. 84-6) at 9-11.) This testimony, however, is hearsay as to the truth of the matter asserted – that she was well-qualified. The Court therefore cannot consider this testimony in determining whether Plaintiff

questions about their knowledge, skills, and abilities.  (*See id.*)  The questions are designed to elicit the amount of experience and knowledge of each applicant.  (*See id.*, Ex. J at 64.)  The computer system then makes a first cut, after which a staffing specialist reviews the candidates that make the first cut.  (*See id.*, Ex. J at 65-66.)  After the computer and staffing specialist make their cuts, the persons that move on are considered qualified for the position, so long as a manager does not challenge the decision.  (*See id.*)  The applicant list is then forwarded to the selection official.  (*See* Pl.'s Am. Cross Mot. for Summ. J., Ex. 18 (Doc. 84-22) at 73.)  Mr. Gutierrez considered the computer list that went to the selecting official to be the list of qualified applicants.  (*See* Def.'s Resp. (Doc. 73-4), Ex. J at 68-71.)

The AVUE computer system found Plaintiff qualified for an Administrative Support Assistant, GS-07, position; a GS-8 lead accounting technician position; and a purchasing agent position, GS-8; and her name was referred to the selecting official for each position.  (*See id.*, Ex. J at 68-69; Pl.'s Am. Cross Mot. for Summ. J., Ex. 21[4] (Doc. 84-25) at 1-3.)[5]  Mr. Gutierrez admitted that Plaintiff's being on the computer-generated list should have meant that she was qualified for

_____

was indeed qualified for the positions.

[4]The Court agrees with Plaintiff that Plaintiff's Exhibit 21, when considered with Mr. Gutierrez's testimony explaining that the documents are standard forms generated by the computer system used by his office, (*see* Pl.'s Am. Cross Mot. for Summ. J., Ex. 18 (Doc. 84-22) at 69-73) makes the exhibit admissible under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6).

[5]Plaintiff asserts that Mr. Gutierrez confirmed that she was qualified and eligible for at least six positions.  (*See* Pl.'s Am. Opp. (Doc. 85) ¶ 13.)  She relies on his testimony interpreting a letter from Chief Bosworth to former Senator Pete Dominici.  (*See* Pl.'s Am. Cross Mot. for Summ. J., Ex. 18 (Doc. 84-22) at 88-89.)  Although Mr. Gutierrez gave his opinion as to what the letter said, he qualified his answers by saying that the information in the letter would have come out of his office, but that he would not have known about it.  (*See id.*)  Because Mr. Gutierrez did not testify that he had personal knowledge of the contents of the letter, his testimony interpreting the letter is inadmissible hearsay.

the position by the computer and staffing specialist and could be selected for the position.  (*See* Pl.'s Am. Cross Mot. for Summ. J., Ex. 18 (Doc. 84-22) at 71-73.)  It is unclear merely from the list, however, whether a staffing specialist had already reviewed the application to verify whether she was qualified or not.  (*See id.*)

Plaintiff avers that by the end of 2005 and beginning of 2006, she became clinically depressed because of her situation, specifically not being able to secure a new position in Albuquerque.  (*See id.*, Ex. 23 (Doc. 84-27) ¶ 15.)  Defendant disputes this fact, noting that Plaintiff has provided no evidence that she was treated for depression.

Plaintiff also states that from April 2003 until January 2006, management and other employees humiliated her.  (*See id.*, Ex. 12 (Doc. 84-15) at 4.)  Plaintiff swears to the following statements.  Throughout 2003 and 2004, Plaintiff overheard Mr. Salinas and other employees call her crazy, not all there, and not right in the head.  (*See id.*, Ex. 4 (Doc. 84-6) at 6 and Ex. 12 (Doc. 84-15) at 4.)  Plaintiff observed other employees staring at her when she approached and snickering at her.  (*See id.*, Ex. 4 (Doc. 84-6) at 6.)  Plaintiff saw Mr. Salinas hold his finger perpendicular to his temple and make circles, indicating that she was crazy.  (*Id.*, Ex. 12 (Doc. 84-15) at 4-5 and Pl.'s Ex. 13 (Doc. 84-16) at 2.)  Mr. Salinas made these types of comments to her at least once a week and made similar comments equally as often to other employees when she was not present, but who reported it to her.  (*See id.*, Ex. 12 (Doc. 84-15) at 4-6 and Ex. 13 (Doc. 84-16) at 2.)

Defendant disputes these facts relating to the hostile work environment.  Mr. Salinas avers that he has never made any comments suggesting that Plaintiff was crazy.  (*See id.*, Ex. 10 (Doc. 84-12) at 4.)  Defendant notes that, other than Mr. Salinas, Plaintiff has not specifically identified the other employee(s) who made comments that she was crazy.

On June 25, 2006, with the assistance from her union, Plaintiff secured an Accounting

Technician position, GS-7, with the Forest Service Albuquerque Service Center, Business Operations, Budget & Finance, Finance Operations, in Albuquerque.  (*See* Def.'s Mot. for Summ. J. (Doc. 65), UF ¶ 15; Def.'s Resp., Ex. K (Doc. 73-5) at 1; Pl.'s Am. Cross Mot. for Summ. J., Ex. 23 (Doc. 84-27) ¶ 16.)  The position was at a lower grade than her position in Lufkin.  (*See* Def.'s Resp., Ex. K (Doc. 73-5) at 1; Pl.'s Am. Cross Mot. for Summ. J., Ex. 23 (Doc. 84-27) ¶ 16.)

Neither Ms. Turner nor Mr. Gutierrez had any knowledge of Plaintiff's prior EEO activity. (Def.'s Mot. for Summ. J. (Doc. 65), UF ¶¶ 17-18.)[6]

On June 27, 2007, Plaintiff had an electroencephalograph performed in Albuquerque.  (*See* Def.'s Resp., Ex. H (Doc. 73-1) at 6-8.)  Dr. Watts testified that he did not see any reason in her medical records to justify getting the procedure.  (*See id.*)

## III.   STANDARD

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party."  *Id.* (internal quotations omitted).  Under Rule 56(c),

---

[6]In Plaintiff's deposition, she testified that Ms. Turner, as the deputy regional forester, should have known everything going on in Region 3, so she should have known about Plaintiff's prior EEO activity.  (*See* Def.'s Mot. for Summ. J., Ex. A (Doc. 65-2) at 165-66.)  Plaintiff also testified that Ms. Turner signed some kind of "deciding officer" form regarding one of the prior EEO matters.  (*See id.*, Ex. A (Doc. 65-2) at 165.)  Plaintiff, however, admits Defendant's fact ¶ 17 that "Turner had no knowledge of Sanchez' prior EEO activity."  (*Compare* Def.'s Mot. for Summ. J. (Doc. 65) ¶ 17, *with* Pl.'s Am. Opp. (Doc. 85) at 8.)  Based on this latter admission, the Court finds that it is undisputed that Ms. Turner had no knowledge of Plaintiff's prior EEO activity.

the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.*; *Kaus v. Standard Ins. Co.*, 985 F.Supp. 1277, 1281 (D. Kan. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson*, 477 U.S. at 248.

## IV.    LEGAL ANALYSIS

### A.    Defendant's Motion for Summary Judgment

Defendant argues that Plaintiff was not a qualified individual with a disability under the Rehabilitation Act, and thus, she cannot establish a prima facie case of discrimination. In addition, Defendant contends her failure to accommodate claim fails because she was not entitled to a transfer as an accommodation. Finally, Defendant asserts that Plaintiff cannot prove a prima facie case of retaliation. Defendant requests the dismissal of Plaintiff's First Amended Complaint with prejudice.

### 1.    Plaintiff is not "disabled" within the meaning of the Act

The Rehabilitation Act ("the Act") prohibits discrimination by the federal government against an "otherwise qualified individual with a disability. *McGeshick v. Principi*, 357 F.3d 1146,

14

1149 (10th Cir. 2004) (quoting 29 U.S.C. § 794).  To make a prima facie case of employment discrimination under the Act, a Plaintiff must prove four elements: (1) that the plaintiff is disabled under the Act; (2) the plaintiff would be "otherwise qualified" to participate in the program; (3) the program receives federal financial assistance or is a federal agency; and (4) the program discriminated against the plaintiff.  *See id.* at 1150.  The standards used to determine whether the Rehabilitation Act has been violated are the same standards applied under the Americans with Disabilities Act ("the ADA").  *Id.* (quoting 29 U.S.C. § 794(d)).

The Act defines "disabled" as "a physical or mental impairment that substantially limits one or more major life activities."  29 U.S.C. § 705(9)(B).  The ADA expands the term disability to mean any one of the following: (A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(2); *McGeshick*, 357 F.3d at 1150.  The parties' arguments are limited to subsection (A).

To meet subsection (A), a plaintiff must satisfy three elements: (1) the plaintiff must have a recognized impairment; (2) the plaintiff must identify one or more appropriate major life activities; and (3) the impairment must substantially limit one or more of those activities.  *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).  The first two elements are legal questions for the court to decide, but determining whether the impairment substantially limits the major life activity is generally a factual question for the jury.  *Id.* (citing *Bristol v. Bd. of County Comm'rs*, 281 F.3d 1148, 1156-57 (10th Cir. 2002)).  The court is to analyze only those major life activities identified by the plaintiff.  *Id.*

A "physical or mental impairment" is defined by the Equal Employment Opportunity Commission ("EEOC") regulations as "[a]ny physiological disorder, or condition, . . . affecting one

or more of the following body systems: neurological, musculoskeletal, special sense organs . . . ." 29 C.F.R. § 1630.2(h)(1). Here, it is undisputed that Plaintiff suffers from a complete left homonymous hemianopsia, which is an injury to the nerves in the brain that transmit the images from the eyes to the brain. She is unable to see objects to the left of her body with either eye when the eyes are focused straight ahead. This neurological condition meets the definition of "physical impairment" and constitutes a recognized impairment, satisfying the first element.

As to the second element, the EEOC defines "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, *seeing*, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (emphasis added). Plaintiff has identified the "major life activity" as "seeing," which is a listed "major life activity" and which her impairment undisputedly affects. Consequently, Plaintiff has met the second element.[7]

With respect to the third element, a physical or mental impairment is substantially limiting if the affected individual is

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). *See also Doebele*, 342 F.3d at 1130 (citing *Pack v. Kmart Corp.*, 166 F.3d

---

[7]Plaintiff makes passing reference in her briefs to the fact that she suffered severe headaches for approximately three years after the accident. (*See, e.g.,* Pl.'s Am. Cross-Mot. for Summ. J. (Doc. 84) at 12-13.) She does not argue, however, that the headaches constituted a separate impairment within the meaning of the Rehabilitation Act. The only "major life activity" Plaintiff has identified, and thus upon which she is limited to relying, is "seeing." Plaintiff has not shown that the headaches affect her ability to see, only that the headaches were another condition she suffered as a result of the TBI. The headaches are therefore not relevant to determining whether Plaintiff is disabled under the Rehabilitation Act.

1300, 1305 (10th Cir. 1999)).  In making this determination, the court considers three factors:  (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment.  29 C.F.R. § 1630.2(j)(2); *Doebele*, 342 F.3d at 1130.  A plaintiff must show more than a "mere difference" between his performance and that of the average individual.  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999).  The "substantially" limiting language suggests a difference that is "considerable." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002), *superseded by statute*, PL 110-325, 122 Stat. 3553.  The court must also consider any mitigating or corrective measures utilized by the individual, such as medications, devices, and measures undertaken, whether consciously or not, with the body's own systems. *Albertson's*, 527 U.S. at 565-66 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)); *Doebele*, 342 F.3d at 1130.[8]

---

[8]Congress amended the ADA, effective January 1, 2009, to supersede and reject the Supreme Court's enunciated requirement in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), that whether an impairment substantially limits a major life activity must be determined with reference to the ameliorative effects of mitigating measures.  ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(2), 122 Stat. 3553.  Congress also rejected the standards set forth by the Supreme Court in *Toyota Motor* that required the terms "substantially" and "major" in the disability definition to be interpreted strictly to create a demanding standard for qualifying as disabled.  ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b)(4).  Additionally, Congress rejected the *Toyota Motor* standard "that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.'" *Id.*  Under the Amendments, an "impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability," and the determination of whether an impairment is substantially limiting must be made without regard to the ameliorative effects of mitigating measures.  *Id.* § 4(a) (amending Section 3 of the ADA).  Congress expressly stated that the definition of disability must be "construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." *Id.*

Plaintiff commenced this action before the amendments became effective, and she has not argued that they should apply to this case.  The Court must construe the definition of

Plaintiff argues that *Toyota Motor* is distinguishable because the Supreme Court was construing what it means to be substantially limited in performing manual tasks. The Court held that for performing manual tasks to fit into the category of "major life activities," the manual tasks in question must be central to daily life. *Toyota Motor*, 534 U.S. at 197. Plaintiff argues that "seeing" is separately listed as a "major life activity," and thus, she is not required to separately show that her ability to see substantially limits her from performing another activity that is of central importance to daily life.

The Court agrees with Plaintiff up to a point. "Seeing" is a separately listed "major life activity" and thus Plaintiff need only prove that her seeing has been substantially limited. *See Albert v. Smith's Food & Drug Centers, Inc.*, 356 F.3d 1242, 1250 n.5 (10th Cir. 2004) (explaining that *Toyota Motor*'s analysis regarding impact of disability on ability to perform basic tasks does not apply to what is required to show substantial limitation in major life activity of breathing). However, the Supreme Court's interpretation in *Toyota Motor* of the term "substantially" does apply to seeing as well. Plaintiff must prove that her sight is considerably limited or severely restricted. *See Toyota Motor*, 534 U.S. at 196-98. Plaintiff must prove, not merely a medical diagnosis of impairment, but that the extent of the limitation caused by her impairment in terms of her own

_____

"disability" under the law in effect at the time the cause of action arose, not under the amended law currently in effect. *See Kirkeberg v. Canadian Pacific Ry.*, 619 F.3d 898, 904 n.2 (8th Cir. 2010) (applying pre-amendment disability definition); *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 641 n.3 (7th Cir. 2010) ("As we have said, because there is no indication that Congress intended the ADA Amendments to have retroactive effect, we rely on the ADA as it existed at the time of the relevant events, and on the case law, including *Williams*, interpreting that version of the statute and implementing regulations."); *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 34 n.3 (1st Cir. 2009) (explaining that 2008 amendments to ADA are not retroactive); *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009) (same); *Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 942 (D.C. Cir. 2009) (same); *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009) (same); *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009) (same).

experience is substantial.  *See id.* at 198 (quoting *Albertson's, Inc.*, 527 U.S. at 566); *Albert*, 356 F.3d at 1250.  How Plaintiff's limited sight affects other activities thus is relevant to the analysis. *Cf. Albert*, 356 F.3d at 1250-51 (discussing as relevant to determination of whether plaintiff's asthma is a disability that her asthma "requires her to avoid a wide variety of everyday situations," like avoiding crowds, night-time or outdoor activities, cigarette smoke, and perfumes).

The Supreme Court has previously addressed a vision impairment, monocular vision, where a person can see out of only one eye.  *See Albertson's*, 527 U.S. at 566-67 & n.12.  In *Albertson's*, the Supreme Court held that the plaintiff's burden to show she was disabled was not an "onerous" one because "people with monocular vision 'ordinarily' will meet the Act's definition of disability." *Id.*  The Supreme Court listed the following factors as relevant to whether a person with monocular vision is disabled: "the degree of  visual acuity in the weaker eye, the age at which they suffered their vision loss, the extent of their compensating adjustments in visual techniques, and the ultimate scope of the restrictions on their visual abilities." *Id.* at 566.  Other circuits have since found that a plaintiff's ability to engage in other life activities, like driving, whether or not the activity is a "major life activity," is relevant to determine whether her ability to see is restricted.  *See, e.g., Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (citing *Capobianco v. City of New York*, 422 F.3d 47, 58 n.7 (2d Cir. 2005)).

The Ninth Circuit described the standard for determining whether seeing is substantially limited as involving a determination of whether a plaintiff's sight as a whole is substantially limited for daily activities:

> We believe a fair reading of *Albertson's*, *Sutton* and *Toyota* requires that for a monocular individual to show that his impairment is a disability, the impairment must prevent or severely restrict use of his eyesight compared with how unimpaired individuals normally use their eyesight in daily life. This comports with *Toyota*'s focus on the daily activities (apart from working) that an impairment affects, and

with the direction from *Sutton* and *Albertson's* that courts make a case by case determination of whether a vision impairment, as corrected or compensated for, is substantially limiting across a broader range of activities than the job at issue. Thus, *some* visual impairment does not necessarily mean that the individual is *substantially* limited in seeing overall; put differently, it does not follow that seeing as a whole is substantially limited just because the individual has a deficiency in some aspect of vision. The critical inquiry is whether seeing as a whole is substantially limited for purposes of daily living.

*E.E.O.C. v. United Parcel Service, Inc.*, 306 F.3d 794, 802-03 (9th Cir. 2002) (emphasis in original).

In this case, Plaintiff has established that she has permanently lost 50 percent of the total visual field in the eye, resulting in the loss of her left peripheral vision. Plaintiff thus has presented evidence that her *peripheral* vision is substantially worse than that of the average person. That alone, however, is insufficient to establish that she is disabled under the Rehabilitation Act. *See Albertson's*, 527 U.S. at 564-65; *United Parcel Service*, 306 F.3d at 802-03. The question is whether Plaintiff's *seeing as a whole* is substantially limited, which this Court must determine by considering whether her complete left homonymous hemianopsia prevents or severely restricts use of her eyesight compared with how unimpaired individuals normally use their eyesight in daily life. *See id.*

Plaintiff admits that her right peripheral and central vision are fine. With corrective lenses, she has 20/20 vision in her central vision. Plaintiff therefore can turn her head and use her central vision to see to the left to compensate for the loss of her left peripheral vision. Plaintiff's impairment has had minimal effect on her daily activities related to sight. Plaintiff has been able to care for herself and walks and bicycles on a regular basis. Although not recommended by doctors, Plaintiff continues to drive, although she generally plans her routes to avoid traffic, highways, and busy roads. Plaintiff is also able to read, although she must be careful to compensate for her lost left peripheral vision by moving her head to the left to make sure she is reading the entire

document.  She has to take extra efforts to concentrate when reading numbers, resulting in tasks with numbers taking longer, which takes its toll on her.  Glare also bothers her, and she can no longer use the computer for more than approximately 45 minutes without experiencing pain and eye strain.  Plaintiff, however, was still able to perform the typical duties of her job in Lufkin.

Plaintiff relies on the testimony of Dr. Watts who analogizes her condition to that of a person with paralysis on the left side of her body.  Dr. Watts's comparison, however, is limited to Plaintiff's ability to greet a child who approaches from her left.  The inability to greet a person by patting that person on the head when she approaches from the left does not amount to a substantial limitation.  Moreover, Dr. Watts admits that he does not know whether Plaintiff actually ignores her left side because he has not examined her and none of the notes he saw addresses her ignoring her left side.  The Court therefore finds that Dr. Watts's analogy is of minimal relevance and is not sufficient to establish that Plaintiff's vision is substantially impaired.

Plaintiff additionally argues that the AMA's rating for a complete left homonymous hemianopsia as a 50% impairment of the whole person establishes that her impairment is severely restrictive.  Plaintiff asserts that she is considered legally blind.  Plaintiff relies on the AMA's Guide that considers a 50-point score to be as "equally disabling as a field restriction to a 10° radius or as a visual acuity loss to 20/200."  (Pl.'s Am. Cross Mot. for Summ. J. (Doc. 84) at 13 (citing Pl.'s Ex. 5 at 295).)  Plaintiff then cites to an EEOC document that states that the term "legally blind" means a visual acuity of 20/200 or worse or a visual field of 20 degrees or less.  (*See id.* (citing Pl.'s Ex. 6 at 2).)[9]  None of the medical experts that have examined Plaintiff and/or her medical files has

---

[9]Defendant argues that the EEOC document is inadmissible hearsay, while Plaintiff contends that EEOC guidance is admissible as non-binding legal authority.  Although the Court may consider EEOC interpretative guidelines as persuasive guidance on legal issues, factual assertions made in the EEOC's guidelines are still subject to the hearsay rules.  Plaintiff has

stated that she is, indeed, legally blind.  Moreover, the AMA's impairment rating and its comparison of her condition to someone with 20/200 visual acuity or with a 10 degree radius visual field are of limited utility, as the AMA guidelines were made and are used in a different context – workers compensation – with different standards and policies.  *Cf. Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 801-05 (1999) (explaining that courts should not apply a negative presumption that a person's receipt of benefits under Social Security Act should estop him or her from pursing an ADA claim because the statutes have different policies underlying them and definitions within statutes differ sufficiently that two claims do not inherently conflict).  Plaintiff has not cited any cases in which a court has relied on the AMA impairment ratings as dispositive under the ADA or the Rehabilitation Act, nor has this Court found any such cases.  *See Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F.Supp. 641, 659 (D.D.C. 1997) ("Nowhere in the ADA does it state that a person disabled pursuant to the AMA guidelines is a qualified individual with a disability, and the plaintiff has provided no such authority.").  This Court, instead, is bound by the Rehabilitation Act's definition of "substantial limitation" and the Supreme Court's admonitions on how to determine whether a plaintiff meets that definition.

After examining the applicable law and considering all the undisputed evidence, this Court concludes as a matter of law that, based on the nature of, the severity of, and the impact resulting from Plaintiff's impairment, Plaintiff's impairment does not rise to the level of a "substantial" visual impairment under the Act.  Plaintiff's visual acuity and the compensating adjustments she makes to see to the left minimize the ultimate scope of restrictions on her overall visual abilities.  Plaintiff's impairment does not severely restrict use of her overall eyesight compared with how the average

---

offered no hearsay exceptions as to the factual assertions made in the EEOC document, and therefore, the Court cannot rely on them.

unimpaired person normally uses his or her eyesight in daily living.  The vast majority of cases analyzing whether a visual impairment meets the definition of "disability" under the ADA supports this Court's conclusion. *Compare Kirkeberg*, 619 F.3d at 904-05 (holding that plaintiff's monocular vision was not disability under ADA because tiring more easily and finding it more difficult to navigate on foot does not rise to level of substantial limitation where plaintiff could read fairly easily and drove with no trouble); *United Parcel Service*, 306 F.3d at 799, 803 (holding that individuals with no vision in right eye and problems with near-field vision in functional eye were not substantially limited under ADA because both could "drive . . . , read, use tools, and play sports"); *Szmaj. v. American Tel. & Tel. Co.*, 291 F.3d 955, 957 (7th Cir.2002) (holding that plaintiff's congenital nystagmus, which made it difficult for him to focus his eyes and prevented him from holding a job in which he had to spend more than 50% of his time reading, was not a disability under ADA because ability to read all day long is not a major life activity); *Still v. Freeport-McMoran, Inc.*, 120 F.3d 50, 52 (5th Cir. 1997) (holding that, even though plaintiff was blind in one eye and had limited peripheral vision, his partial blindness did not "substantially limit" his sight because he was able to perform normal daily activities, like driving cars); *Monell v. Kansas Ass'n of Sch. Bds.*, 2001 WL 487766, *4-6 (D. Kan. Apr. 18, 2001) (unpublished opinion) (plaintiff who suffered from double vision was not "substantially limited" in major life activity of seeing, even though she was restricted in driving to board meetings at night and in performing tasks on computer for long periods of time, where she could still drive to work and perform typical duties of her job); *Overturf v. Penn Ventilator, Co., Inc.*, 929 F.Supp. 895, 898 (E.D.Pa.1996) (holding that tumor behind one eye which caused double, and sometimes triple vision, and resulted in loss of peripheral vision was not a disability under the ADA because he could compensate by adjusting his line of vision and perform tasks of his job, drive car, watch television, and read); *with Capobianco*, 422 F.3d at 58-59 (holding

23

that question of fact existed for jury as to whether night blindness was disability where impairment severely limited plaintiff's ability to see at night or in dim light, impairment could not be corrected, impact was permanent, plaintiff could not drive at night or in dim light, and that he was unable to safely walk, run, or ride a bicycle outdoors at night, and was severely restricted in outdoor night-time activities in general).  Accordingly, Plaintiff does not have a disability within the meaning of the Rehabilitation Act.

Because Plaintiff has failed to show sufficient evidence to survive summary judgment that she has a disability within the meaning of the Rehabilitation Act, Defendants are entitled to summary judgment on both Count I, the failure to accommodate claim, and Count III, the hostile work environment claim.  *See Lanman v. Johnson County*, 393 F.3d 1151, 1156 (10th Cir. 2004) (explaining that, to succeed on a Rehabilitation Act claim, premised on either a failure to accommodate or a hostile work environment, a plaintiff must establish as a threshold matter that she has a disability).[10]  The Court therefore has no need to resolve Defendant's alternate argument that Plaintiff cannot show that she was entitled to a transfer as a reasonable accommodation.

### 2.    Plaintiff has not presented evidence to establish a causal link between her protected activity and the alleged adverse action

In Count II, Plaintiff contends that Defendant violated Title VII by refusing to provide Plaintiff a hardship transfer in retaliation for her prior protected activity during the period from 1999 to 2003 "under the Rehabilitation Act when she provided witness statements for four co-workers each of whom had filed complaints of discrimination."  (First Am. Compl. (Doc. 33) ¶ 43.)  Plaintiff

---

[10]Plaintiff's hostile work environment claim appears to rely, at least in part if not wholly, on comments made to Plaintiff by employees that she was "crazy."  (*See* First Am. Compl. (Doc. 33) ¶ 48.)  Plaintiff, however, has not argued that her disability is any type of mental impairment or that she was regarded as having a mental impairment.  This Court has therefore limited its disability analysis to Plaintiff's vision impairment.

alleges that the adverse action against her was Defendant's refusal "to provide Plaintiff reasonable accommodation for her disability by a hardship transfer to Region 3 when it provided hardship transfers for other non-disabled employees who had not engaged in any protected activity." (*Id.*) Defendant argues that Plaintiff's retaliation claim fails because she cannot show that any of the management personnel responsible for making the decision not to transfer her knew of Plaintiff's prior EEO activity. (*See* Def.'s Mot. for Summ. J. (Doc. 65) at 13-14.) Plaintiff has not addressed this argument regarding Count II in any of her briefs.

To make a prima facie case for retaliation, the plaintiff must show that (1) she engaged in protected activity, (2) that she suffered a materially adverse action either after or contemporaneous with her protected activity; and (3) there was a causal link between the protected activity and the adverse action. *Mathews v. Denver Newspaper Agency LLP*, __ F.3d __, 2011 WL 892752, *10 (10th Cir. 2011). To satisfy the causal connection element, a plaintiff must show that the individual who took the adverse action against her knew of the employee's protected activity, or that the person harboring discriminatory animus, knew and used "the person who effected the adverse action, 'as a cat's paw to effect . . . her own biased designs.'" *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (quoting *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1253 (10th Cir.2006)).

It is undisputed that neither Ms. Turner nor Mr. Gutierrez had any knowledge of Plaintiff's prior EEO activity supporting her co-workers' discrimination complaints. Nor does Plaintiff assert that another employee took adverse action against her and knew of her prior EEO activity. Plaintiff therefore has not shown the requisite causal connection between her prior EEO activity and the alleged adverse action to survive summary judgment. Defendant is thus entitled to summary judgment on Count II, Plaintiff's Title VII retaliation claim.

### B.    Plaintiff's Cross-Motion for Summary Judgment

Plaintiff moves for summary judgment on her claim of discrimination based on Defendant's alleged failure to provide her reasonable accommodation for her disability.  This Court has found that Plaintiff cannot prove that she was disabled under the Rehabilitation Act as a matter of law and will grant summary judgment for Defendant.  Plaintiff's cross-motion for summary judgment will be denied for the same reasons.

**IT IS THEREFORE ORDERED** that

1.      Defendant's Motion for Summary Judgment and Memorandum in Support (**Doc. 65**) is **GRANTED**;

2.      Plaintiff's Cross-Motion for Summary Judgment (**Doc. 66**) is **DENIED** as **MOOT**;

3.      Plaintiff's Amended Cross-Motion for Summary Judgment (**Doc. 84**) is **DENIED**; and

4.      Defendant is entitled to summary judgment on all Plaintiff's claims.

_____
SENIOR UNITED STATES DISTRICT JUDGE